IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| RUBEN MARTINEZ, ) | |
| ) | |
| Petitioner, ) | No. 3:10-00677 |
| ) | Chief Judge Haynes |
| v. ) | |
| ) | |
| JOSEPH EASTERLING, Warden, ) | |
| ) | |
| Respondent. ) | |

## M E M O R A N D U M

Petitioner, Ruben Martinez, filed this pro se action seeking the writ of habeas corpus to set aside his five (5) state convictions of aggravated rape for which Petitioner received 22 years for each conviction and consecutive sentences for an effective sentence of 88 years. After a review of the petition, the Court ordered the Respondent to file an answer to the petition and appointed the Federal Public Defender to represent Petitioner. In his amended petition, Petitioner asserts the following claims: (1) his sentence was enhanced by factors not found by a jury and thus, violated his Sixth Amendment right to a jury trial; (2) that he was improperly sentenced to consecutive sentences based upon facts not found by a jury; (3) that his 88-year sentence violates the extradition agreement between the United States and Mexico because his sentence is effectively a life sentence; and (4) that the State violated his due process rights by denying him pretrial jail credit. The Respondent filed an answer and the state record. Upon review of the record in this action, the Court concludes that Petitioner's claims can be decided on the state record that was filed in this action.

### A. Procedural History

On February 15, 2008, Petitioner pled guilty to five counts of aggravated rape in the Criminal

1

Court of Davidson County, Tennessee, and received an effective 88-year sentence, consisting of four consecutive 22-year terms. On direct appeal, Petitioner's convictions and sentences were affirmed. State v. Ruben Martinez, No. M2008-777-CCA-R3-CD, 2010 WL 99345, at *1 (Tenn. Crim. App. Jan. 11, 2010). On June 18, 2010, the Tennessee Supreme Court denied his application for permission to appeal. Id.

### B. State Court Findings

On his direct appeal, the Tennessee Court of Criminal Appeals made the following findings of facts[1] underlying Petitioner's convictions.

> At the guilty plea hearing, the defendant indicated that he understood the charges against him and his potential range of punishment. The trial court informed the defendant of his constitutional rights that he was waiving by pleading guilty, and the defendant said he understood those rights. The defendant also said that he discussed the charges with his counsel and that he was satisfied with counsel's representation.
>
> During the hearing, the state recited the factual bases underlying the defendant's pleas. In case number 2002-B-739 the relevant facts were as follows:
>
> [Victim 2] was awakened by someone being on her bed. [Victim 2's] apartment had had the back door forced open. Two male individuals came into her apartment and made their way into her bedroom. [Victim 2] ... was ... forced to have sexual acts performed on her.
>
> As it relates to Count Two specifically, the [d]efendant ... forced his penis into [Victim 2's] vagina. While this was occurring, the second suspect placed [Victim 2's] left hand on his penis and forced her to masturbate him.
>
> As to Count Three, the specific facts would be that the [d]efendant ... changed his position and moved toward the head of the bed and forced [Victim 2] ... to perform fellatio on him.
>
> While this was occurring, the second individual ... forced her to have her hand on his

---

[1] State appellate court opinion findings can constitute factual findings in a habeas action. Sumner v. Mata, 449 U.S. 539, 546-47 (1981) and have a statutory presumption of correctness 28 U.S.C. § 2254(e).

2

penis and masturbate him.

As it relates to Count Four specifically, ... the [d]efendant ... penetrated [Victim 2's] anus with his penis.

While this penetration was occurring, suspect number two forced his penis into [Victim 2's] mouth, forcing her to perform fellatio.

The attack occurred over a period of time. Ultimately the two men left the residence, and [Victim 2] contacted the police.

The defendant admitted that he raped the victim vaginally while aided by a second person as stated in count two. He also admitted that he raped the victim by oral penetration with his penis while aided by a second person and that he was criminally responsible for rape when the second person raped the victim with his aid. The defendant pled guilty to these three counts of aggravated rape.

In case number 2002-B-738, the state recited the following pertinent facts:

Around [1:45], in the morning of March [29, 1998], the [d]efendant ... and his accomplice pried open the back door of [Victim 3's] residence.

She was asleep in her bed, when she was awakened by these two men. The [d]efendant ... forced his penis into [Victim 3's] vagina and ejaculated. This was done while she was holding her baby.

The second individual was present there in the apartment as this occurred, and assisted in taking a stereo and various items from the apartment[.]

The defendant stated that the portion of the statement that said he had forced vaginal intercourse with the victim while aided by the second individual was true and correct, and the defendant pled guilty to that count of the indictment.

The facts presented by the state for case number 2002-B-737 were as follows:

[Victim 4] was alone, she believed, in her apartment, as she prepared to go to bed. She walked to her bedroom and discovered that two men had forced entry through a window in her bedroom and were waiting for her in her bedroom.

These two men, and specifically [the defendant], penetrated [Victim 4's] vagina with his penis. While this penetration was occurring, the second suspect ... forced [Victim 4's] mouth on his penis.

3

After several hours the two men left [Victim 4] in her apartment, but took with them items including a stereo boom box.

The defendant said that the statement concerning forced vaginal intercourse with this victim was true and correct, and he pled guilty to count two of aggravated rape.

The trial court found a factual basis for each plea and that the defendant entered them knowingly and voluntarily. The state asked for a sentencing hearing and recommended that the defendant serve his sentences at 100% as a violent offender. The state conceded that the defendant was a Range I offender.

On April 4, 2008, the trial court held a sentencing hearing. At the hearing, the state submitted the pre-sentence report. The state also submitted as exhibits certified copies of the defendant's convictions for criminal trespass, disorderly conduct, driving while intoxicated, and assault.

At the hearing, Victim 1 testified that on November 18 and 19, 1997 she was living at the Huntington Park Manor apartments on Edmondson Pike, off McMurray Drive. She said that early in the morning on November 19, she awakened and saw "a light on in [her] home, that [she] did not leave on." She stated that she "looked down the hallway from [her] bedroom, [and she] could see somebody coming down the hallway towards [her] bedroom." Victim 1 realized that it was not someone she knew or that should be in her home. She "tried to gather the blankets around [herself] and get outta [sic] that room that [she] was in." She did not make it out of the room and the person pushed her back onto her bed. Victim 1 said that she was not fully clothed, and the man "attempted to try to get the blankets off [her]." She stated that she "knew he was gonna [sic] try to rape [her]," so she tried to "insinuate that [she] had some type of AIDS or something really bad, that he could [contract] if he were to rape [her]." The man eventually believed her, but "he asked if he could still look at her...." Victim 1 stated that he took the blankets off her and "tore at [her] bra...." She further stated that "in the process of all this, he did try to get [her] to help him masturbate." She testified that he tried to make her touch his genitals, and she "put her hand on him, but [she] quickly pulled it away." Victim 1 recounted that "[h]e did get [her] bra off, and ... [she] pulled it back on.... [She] told him, if he left any kinda [sic] evidence or anything, that he would be caught...." According to Victim 1 "that pretty much scared him off, and ... he started to get himself together and ... leave." She said that on his way out of the door he told her not to follow him because he was sick.

Victim 1 testified that only one person came to her home. She said that during the attack, the man was not wearing a condom. Victim 1 stated that she believed the man was in an excited state and that he ejaculated near her bed. Victim 1 said that she identified the man as the first picture in a photographic lineup shown to her by the police.

4

Officer Thomas E. Simpkins, of the Metro Nashville Police Department, testified that he responded to a scene at McMurray Drive. He stated that he processed the scene for evidence and collected a latent fingerprint from the bedroom window where the perpetrator entered. He also collected a semen sample from the bed.

Linda Wilson, of the Metropolitan Nashville Police Department Identification Section, testified that she compared the latent print collected by Officer Simpkins with known prints. Based on that comparison, she found that "the palm print left on the point of entry inside window sill was one and the same as a Ruben Hernandez Martinez." On cross-examination, Ms. Wilson testified that she made her findings on August 13, 2006. Authorities took the defendant's palm print on June 21, 2006, and she made her comparison after that date.

Victim 2 testified that in November 1997, she was living in the Danbury Condominiums off Edmondson Pike in South Nashville. She said that she lived alone in a ground floor condominium. She stated that on November 22, 1997, she "woke up at three o'clock in the morning to someone in [her] bed." Victim 2 thought it might have been her boyfriend because she wore glasses and could not see well; however, she eventually realized that it was not her boyfriend. She said that there was "someone in [her] bed and another one to the left of [her.]" Victim 2 testified that the defendant "had his legs around [her] legs and proceeded to rape [her] vaginally...." While the defendant was raping her, the second man made her masturbate him while he fondled her breasts. Victim 2 stated that during the attack the defendant asked her questions about herself. She further stated that he repeatedly said that he wanted to have sex with her and "that it was good."

According to Victim 2, after he raped her vaginally, the defendant wanted to look at her. She said that "he took [her] shirt and wrapped it around her head, so [she] wouldn't see him." The defendant then raped her vaginally and anally. While this was occurring, the second man laid down on the bed and wanted her to perform oral sex on him. According to Victim 2, the defendant was the "dominant male" in the rapes. Victim stated that during the attack the defendant had a gun, and he held the gun to her head.

Victim 2 testified that the men took [her] to the bathroom down the hall and the defendant again raped her vaginally and anally. Victim 2 stated that the second man "would keep coming back to the bathroom door ... as a watch." Victim 2 said that after the rape, the defendant "kept explaining how much he loved [her] and wanted to be with [her]...." He also told her about his family and girlfriend in Mexico. During this conversation, the defendant told Victim 2 that he had been watching her have sex with her boyfriend at night through her living room window. Victim 2 stated that the defendant asked her "to leave [her] windows open, so he could watch [her]

5

and [her] boyfriend at night." The defendant also asked for a picture of her, and he told her he would fix the door they had broken.

On cross-examination, Victim 2 testified that at the time the individuals appeared in her bedroom it was dark outside, her blinds were closed, and her lights were off. On redirect examination Victim 2 stated that neither man wore a condom during the attacks. Consequently, she "went through a year of AIDS testing, wondering if [she] would end up being infected with something." Victim 2 stated that she has lived in fear for ten years and "can't go outside by [herself] at night. [She] can't stay by herself." She said that she did not want her children to see her scared. After the attacks she did not return to the apartment and eventually moved from Nashville.

Victim 3 testified that on March 29, 1998, she was living with her seven-month-old son in a ground floor apartment in Antioch, Tennessee. Her apartment had one bedroom that she shared with her son. Victim 3 woke up during the early morning on March 29, and someone was in her bedroom. The person "ran over to [her] and he said ... that [she] couldn't scream." Victim 3 said that he put a pillow over her face so she could not scream. She stated that because she was nursing her son, she "didn't sleep with anything on...." Victim 3 described the man as having "light-skin, dark hair, [a] mullet haircut ... [and] a Hispanic accent." She said the man put boxer shorts over her head and vaginally raped her. Besides the vaginal penetration, he also performed oral sex on her.

Victim 3 stated that she became aware of another man that was "roaming around [her] apartment. Victim 3 further stated that while the first man "was raping [her], [her] son started crying, [the second man] brought him over to [her], [she] started nursing [her] son, [and the first man] proceeded to rape [her] as [she] was holding her son and nursing him." According to Victim 3, only the first man sexually assaulted her, raped her, and ejaculated. She stated that during the attack the man said he had a gun, but the only weapon she saw was a paint scraper. She further stated that the man would hold the paint scraper to her neck. Victim 3 said that the men took a stereo and approximately twelve dollars from her apartment.

After the attack, Victim 3 went to the hospital and had a medical-legal exam done. She suffered vaginal tearing a result of the attack. Victim 3 said that she had to take medication that entered the blood stream, which affected her ability to nurse her son. Victim 3 stated that she never returned to her apartment after the attack, and she was "afraid to live alone...." She further stated that the attack made her "feel like [she was not] worth anything, [and] that [she] brought this upon [herself]."

Victim 4 testified that on May 17, 1998, she was living with her son and a roommate in the Country Place Apartments on Edmondson Pike. She described her apartment as a "corner, ground-floor apartment; and the whole back area was wooded." On May

17, her son was spending the night with a friend, and her roommate was in Knoxville, so she was home by herself. Victim 4 stated that she went out the night of May 16, and she returned home around 2:30 a.m. on May 17. To get in her apartment, Victim 4 had to unlock the deadbolt and her doorknob. She said this was unusual because she had only locked the doorknob when she left. When Victim 4 went inside her apartment all of the lights were on, and she assumed her roommate came home early. Victim 4 "listened to [her] answering machine messages, ... made some breakfast, and sat down and watched some music videos" before she decided to go to bed.

Victim 4 stated that she walked down the hall to her bedroom, and she noticed that her door was "cracked open, like, an inch or so." She said that "the door flew open and two Hispanic guys came at [her] with a knife and said, '[d]on't scream." Victim 4 stated that the defendant "had [her] nylons over his face and his head," and Luis Castanon "had a pair of [her] panties on his head." She said that she was "fighting with them to try to get away, and they wrestled [her] to the ground...." Victim 4 testified that they cut her clothing off, and Castanon took off her shoes while the defendant held the knife to her throat.

After they removed her clothes and shoes, Castanon attempted to rape her vaginally. However, he could not rape her because he was not erect. Castanon got off Victim 4, and the defendant vaginally raped her while Castanon forced her to perform oral sex on him. Victim 4 said that the defendant also gave her oral sex. According to Victim 4 the defendant taunted her and said things like "I love America. I wanna [sic] give you a Mexican baby" while he attacked her. Victim 4 recalled that while the defendant was raping her, Castanon was "continuously putting his penis in [her] mouth and putting his fingers inside [her] anally."

Victim 4 said that at one point both men attempted to make her perform oral sex on them simultaneously, but her "mouth was so sore[ ][she] begged them not to make [her] do it again." Victim 4 stated that the men were going to either "f* *k [her] some more or [she] was gonna [sic] have to perform more oral sex. So, [she] gave in to the oral sex...." Victim 4 testified that the men held her up in front of her window and told her they were showing her to their friends. She further testified that the men told her that she would have to have sex with their friends too. Victim 4 stated that during the attacks, the men made her keep her eyes shut, and the defendant held the knife "up near [her] throat...." Victim 4 told the men she was tired and needed a break. During the break, they "sat in a circle, kind of Indian-style," and Victim 4 smoked a cigarette. Victim 4 testified that they discussed their families and she "tried to get [the defendant] to talk as much as [she] could."

After the rapes and sexual assaults stopped, the defendant forced Victim 4 into the bathroom at knife point and made her get in the shower. According to Victim 4, the defendant told Castanon to "[c]lean her up[;]" however, "[Castanon] just laid on the

7

floor." Victim 4 stated that Castanon ejaculated on her neck, and she was careful to preserve that evidence. The defendant told her to stay in the shower for ten minutes, but her fire alarm went off, and the men left.

Victim 4 recalled that a week before the attack she noticed a man outside her apartment while she was on her patio with her son. She said that while the defendant was raping her, he confirmed that he was the man outside who had been looking at her.

Because of the attacks, Victim 4 received several bruises, cuts, and scrapes. Victim 4 stated that she never returned to live in the apartment, and she has suffered "great fear" because of the attacks. She further stated that she took "great pains to protect [her son] from knowing any of the details" of her rape; however, he eventually found out through an America's Most Wanted tape. Victim 4 said that she had to take antidepressants and medicine to help her sleep.

Sharon Horton-Jenkins testified that in the late nineteen-nineties she was a Serology/DNA Analyst with the Tennessee Bureau of Investigation (TBI). In her testimony, she summarized an affidavit submitted on her behalf as part of the extradition request. The affidavit stated that she used the Polymarker DQA-One DNA analysis method to identify and profile sperm and semen. In Victim 1's case, Ms. Horton-Jenkins identified sperm and semen from a bed cover. She also identified sperm and semen from a vaginal swab of Victim 3. According to Ms. Horton-Jenkins "[t]he DNA profile obtained from both the bed cover and the vaginal swab were consistent with each other. Thus, it is believed that they are from the same individual." Ms. Horton-Jenkins stated that "the DNA profiles appear to be from an individual closely related to Luis Martinez." She further stated that she believed DNA profiles from two additional cases were all from the same individual. Ms. Horton-Jenkins testified that the DNA profiles taken from each of the present cases are consistent with each other.

On cross-examination, Ms. Horton-Jenkins testified that Chad Johnson, a Special Agent Forensic Scientist with the TBI, received the DNA samples. Ms. Horton-Jenkins agreed that it is possible for DNA to degrade in the presence of high humidity and that other factors might affect it. She stated that storing something in a black plastic bag could increase humidity in the bag. Ms. Horton-Jenkins said that she received the bed cover that she tested in a brown paper bag. She only received a cutting from the cover and did not know what they stored the actual cover in. She stated that at the time of her affidavit, she only had a comparison to Luis Martinez, who was not the defendant.

Chad D. Johnson testified that he signed an affidavit submitted for the extradition of the defendant. He said that the affidavit concerned evidence collected in Victim 2 and

Victim 4's cases. Mr. Johnson testified that the affidavit indicated that in Victim 2's case the sperm and semen were collected from a back swab, and in Victim 4's case they were collected from vaginal and rectal swabs. He stated that the three samples generated a DNA profile that was "very similar" to Luis Martinez's DNA profile, "thus the DNA profile appears to be from an individual closely related to ... Luis Martinez."

Mr. Johnson said that when Mexico extradited the defendant, the DQA-One polymarker provided the defendant's DNA profile, and Mr. Johnson compared it with the profiles in the four cases. After Mr. Johnson conducted the comparison, he found that the defendant's DNA profile was the same as the profiles in the four cases. Mr. Johnson stated that in Victim 2's case, "the bed sheets were analyzed and identified as a profile from [the defendant]." He stated that in Victim 3's case, he compared her bed sheets with the defendant's DNA profile and found that they matched. According to Mr. Johnson, the statistics on the analyses exceeded the world's population, which allowed him to opine with certainty that the profiles were matches.

Isabel Barcenas testified that she was married to the defendant at the time of the incidents. She said that they and their children lived in South Nashville. She recalled that "[o]n one occasion ... [she] was trying to leave and he broke the window of [her] truck with [her and her children] in the ... van, and all the glass splattered everywhere." According to Ms. Barcenas, the defendant "kept threatening to hurt [them]," and he also threatened to kill her. She stated that the defendant told her that "if [she] ever had children from someone else, he would come and do something to [her] children, ... and take [her] also."

Ms. Barcenas said that she became concerned that the defendant might be one of the "South Nashville Rapists" after there "was some talk at work about it...." She stated that she confronted him about it, but "he just stayed quiet." Ms. Barcenas thought it might be the defendant "[b]ecause it was ... a coincidence that him and his friend were always together at night, leaving at night and not coming back [until the] early hours of the morning."

Ms. Barcenas testified that the defendant told her to take him to Houston so that he could go to Mexico to see his mother. She stated that Luis Martinez was the defendant's brother. According to Ms. Barcenas, Luis Martinez's wife told her that the defendant's picture was in the newspaper. Ms. Barcenas confronted the defendant, and he admitted to her that he was the one who committed the rapes.

Martinez, 2010 WL 99345 at *1-7 (footnotes omitted).

## C. Conclusions of Law

Petitioner's habeas petition is governed by the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). Lindh v. Murphy, 521 U.S. 320, 336 (1997). Under the AEDPA, federal courts may not grant habeas relief for claims adjudicated on their merits in a state court proceeding, unless that state court proceeding:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

28 U.S.C. § 2254(d).

In Williams v. Taylor, 529 U.S. 362, 413 (2000), the Supreme Court stated that a state court judgment is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court on a set of materially indistinguishable facts." The Supreme Court interpreted the language "clearly established Federal law, as determined by the Supreme Court of the United States" as referring to "holdings, as opposed to dicta" of its decisions "as of the time of the relevant state-court decision." Id. at 412.

In Greene v. Fisher, 132 S. Ct. 38, 44 (2011), the Supreme Court considered whether "'clearly established Federal law' includes decisions of this Court that are announced after the last adjudications of the merits in state court but before the defendant's conviction becomes final" and answered the question in the affirmative. There, a Supreme Court decision at issue was rendered two months after the state supreme court upheld the petitioner's convictions. The Supreme Court held

that its decision was not clearly established at the time of the state supreme court's decision. Id. . The Supreme Court noted a different result if the Petitioner had applied for the writ of certiorari or had filed a state post-conviction petition. Id. at 45.

In Bell v. Cone, 535 U.S. 685, 693 (2002), the Supreme Court reiterated that the AEDPA modified a federal court's role in reviewing state prisoner applications "in order to prevent federal habeas 'retrials' and to ensure that state court convictions are given effect to the extent possible under the law." Under the "unreasonable application" clause, a state court judgment results in an "unreasonable application" of clearly established federal law "if the state court identifies the correct governing legal rule from [the Supreme] Court's decision but unreasonably applies that principle to the facts of the prisoner's case." Id. The Supreme Court explained that a state court's application of clearly established federal law must be "objectively unreasonable," and a federal habeas court may not grant habeas relief "simply because that court concludes in its independent judgment that the relevant decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411. A state court's application of federal law is unreasonable and habeas relief may be granted if the "state court decision is so clearly incorrect that it would not be debatable among reasonable jurists." Herbert v. Billy, 160 F.3d 1131, 1135 (6th Cir. 1998) (quoting Drinkard v. Johnson, 97 F.3d 751, 769 (5th Cir. 1996)).

In deciding habeas claims, the Supreme Court reiterated that such claims are to be decided on the record before the state court:

> In this and related contexts we have made clear that whether a state court's decision was unreasonable must be assessed in light of the record the court had before it. See Yarborough v. Gentry, 540 U.S. 1, 6, 124 S.Ct. 1, 157 L.Ed.2d 1 (2003) (per curiam) 124 S.Ct., at 4 (denying relief where state court's application of federal law was "supported by the record"); Miller-El v. Cockrell, 537 U.S. 322, 348, 123 S.Ct. 1029,

11

154 L.Ed.2d 931 (2003) (reasonableness of state court's factual finding assessed "in light of the record before the court"); *cf.* Bell v. Cone, 535 U.S. 685, 697, n. 4, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002) (declining to consider evidence not presented to state court in determining whether its decision was contrary to federal law).

Holland v. Jackson, 542 U.S. 649, 652 (2004) (emphasis added). The district court also "must presume that all determinations of factual issues made by the state court are correct unless the Defendant can rebut that presumption by clear and convincing evidence." Mitchell v. Mason, 325 F.3d 732, 738 (6th Cir. 2003) (citing 28 U.S.C. § 2254(e)(1)). This presumption includes credibility findings of the state courts. Skaggs v. Parker, 235 F.3d 261, 266 (6th Cir. 2001).

### 1. The Blakely Claim

Petitioner first contends that his sentence was enhanced by factors not found by a jury and thus, the trial court's sentence violated his Sixth Amendment right to a jury trial. Citing federal law, the Tennessee Court of Criminal Appeals upheld the Petitioner's consecutive sentences because the state trial court could consider Petitioner's prior convictions that were admitted without objection. The Tennessee appellate court reasoned as follows:

> In Blakely v. Washington, the United States Supreme Court held that a trial judge may impose a sentence that exceeds the presumptive sentence based only on the fact of a defendant's prior conviction(s) or on other enhancement factors found by the jury or admitted by a defendant. Blakely, 542 U.S. 296, 301-04, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004). After that, the United States Supreme Court released its decision in Cunningham v. California, holding that California's sentencing scheme did not survive Sixth Amendment scrutiny under Blakely. Cunningham, 549 U.S. 270, 127 S.Ct. 856, 166 L.Ed.2d 856 (2007). In short, the Blakey-Cunningham regime instructs that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." Blakely, 542 U.S. at 301 (quoting Apprendi v. New Jersey, 530 U.S. 466 at 490, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000)).
>
> Effective June 7, 2005, the Tennessee General Assembly, in response to the United States Supreme Court case of Blakely v. Washington, amended Tennessee Code

Annotated sections 40-35-102, -210, and -401 to reflect the advisory nature of enhancement factors. See 2005 Tenn. Pub. Acts ch. 353, §§ 1, 6, 8. The General Assembly also provided that a defendant who is sentenced after June 7, 2005, for offenses committed on or after July 1, 1982, may elect to be sentenced under the amended provisions of the Act by executing a waiver of ex post facto protections. Id. In the instant case, the defendant committed the offenses before the effective date of the amended provisions of the Sentencing Act and chose for the court to sentence him under the sentencing statutes in effect at the time the offenses were committed. Thus, the 2005 amendments to the Sentencing Act do not apply to the defendant.

Before the 2005 amendments, the 1989 Sentencing Act stated, "[t]he presumptive sentence for a Class A felony shall be the midpoint of the range if there are no enhancement or mitigating factors." Tenn.Code Ann. § 40-35-210(c) (2003). Additionally, the prior statute required, "[s]hould there be enhancement and mitigating factors for a Class A felony, the court must start at the midpoint of the range, enhance the sentence within the range as appropriate for the enhancement factors, and then reduce the sentence within the range as appropriate for the mitigating factors." Id. § 40-35-210(e). The previous act also mandated "[w]henever the court imposes a sentence, it shall place on the record either orally or in writing what enhancement or mitigating factors it found...." Id. § 40-35-210(f).

**When determining the defendant's sentence, the trial court mentioned factors such as the use of a weapon and the injuries that the victims sustained, but the trial court did not consider them for enhancement purposes. When determining to enhance the defendant's sentences, the trial court specifically noted:**

> **What I can do, in terms of our sentencing law, is use [the defendant's] prior convictions to enhance sentences. Those convictions we've now heard about include the five that have been introduced and are present in the pre-sentence report and the additional DUI that Ms. Barcenas testified about.**
>
> **Granted, those aren't prior rapes, prior serious felony offenses; but it is important to the [c]ourt that they are there, number one, and at least two of them involve assaultive behavior, one of which we heard about from [the defendant's] ex-wife....**
>
> **[T]hat prior criminal record is present and can be used to enhance [the defendant's] sentences on each of these counts; and the assaultive behavior is important to the [c]ourt ... for purposes of sentencing.**
>
> **One of the convictions dealing with the trespass ... dealt with him**

13

> being around peeking into someone's property, which is exactly
> what occurs in each of these situations initially.
>
> The defense did not submit nor did the court find any mitigating factors. The court sentenced the defendant to twenty-two years for each count.
>
> When it determined whether to enhance the defendant's sentences, the trial court explicitly stated that it could not use information obtained from the victim's testimony to enhance his sentences. **The record reflects that the court gave considerable weight to the defendant's "previous history of criminal convictions or criminal behavior." Tenn.Code Ann. § 40-35-114(1).** According to the pre-sentence report, the defendant had one prior criminal trespass conviction, two prior assault convictions, one disorderly conduct conviction, and one driving while intoxicated conviction. In addition, the state introduced as exhibits certified copies of these convictions without any objection. **The court found that the defendant had a prior history of criminal convictions and behavior and enhanced his sentences beyond the presumptive sentence of twenty years. Our review of the record confirms that the consideration and application of enhancement factors by the trial court complied with Blakely and Cunningham.** See State v. Gomez, 239 S.W.3d 733 (Tenn.2007). Accordingly, the defendant is without relief for this issue.

Martinez, 2010 WL 99345, at *9-10 (emphasis added).

Here, the state trial courts upheld the Petitioner's sentence based upon his prior convictions, as permitted by Blakely. The Tennessee Court of Criminal Appeals quoted Blakely to conclude that the imposition of consecutive sentences for Petitioner's rape convictions, based upon his prior convictions involving serious crimes of violence, was permissible. These convictions were admitted without objection. Thus, the Court concludes that the state courts reasonably applied Blakely and this claim lacks merit.

### 2. Consecutive Sentencing

Petitioner's next claim alleges that he was improperly sentenced to consecutive sentences under Tennessee law and that his consecutive sentence is unlawful because that sentence was based upon facts that were not found by a jury. Petitioner seeks to extend Blakely to consecutive

14

sentencing, but Oregon v. Ice, 555 U.S. 160 (2009) rejected this extension. Petitioner's consecutive sentencing claim was present to the state courts as a state law claim. (Docket Entry No. 1, Addendum 2 Petitioner's Brief at 15-18). As the Sixth Circuit stated, "we may not issue the writ on the basis of a perceived error of state law." Brown v. Bradshaw, 531 F.3d 433, 438 (6th Cir. 2008). In any event, this claim is now barred by the one-year limitations period and one-petition rule of Tenn. Code Ann. § 40-30-102. Thus this claim is also procedurally defaulted without a showing of cause or prejudice. Johnson v. Mississippi, 486 U.S. 578, 587 (1988). Accordingly, this claim lacks merit.

### 3. Extradition Agreement Claim

Petitioner next contends that his 88-year sentence is effectively a life sentence that violates the extradition agreement between the United States and Mexico. The Tennessee Court of Criminal Appeals rejected this claim.

> The defendant essentially argues that because of his age, the term of year sentences amount to life sentences. We disagree. The defendant admitted to committing the rapes, and the grand jury indicted him for several charges in multiple cases. In the cases that he pled guilty, the court sentenced him to a term of years for his crimes. **The defendant has failed to provide any evidence that indicated that the term "life sentence" as used in the agreement means any sentence that would exceed the defendant's life expectancy. We conclude that the effective eighty-eight year sentence is not a life sentence in violation of the extradition agreement, and the defendant is not entitled to relief on this issue.**

Martinez, 2010 WL 99345, at *12 (emphasis added).

Here, given the evidence for these multiple convictions, Petitioner does not cite any clearly established Supreme Court decision that recognizes this claim as a basis for habeas relief.

### 4. Denial of Pretrial Jail Credit

Petitioner alleges that the State violated his due process rights by denying him credit for his

pretrial detention. For this claim, the Tennessee appellate court ruled as follows:

> Finally, the defendant argues that the trial court erred in denying pretrial jail credit. The defendant contends that the trial court should have credited him for the time he spent in a Mexican jail pursuant to the federal warrant. The state responds that the defendant is only entitled to pretrial jail credit for time served after Tennessee authorities served him with the arrest warrants on June 21, 2006.
>
> Tennessee Code Annotated section 40-23-101 governs the trial court's application of pretrial jail credit. Under T.C.A. § 40-23-101(c):
>
>> The trial court shall, at the time the sentence is imposed and the defendant is committed to jail ... for imprisonment, render the judgment of the court so as to allow the defendant credit on the sentence for any period of time for which the defendant was committed and held in the city jail or juvenile court detention prior to waiver of juvenile court jurisdiction, or county jail or workhouse, pending arraignment and trial. The defendant shall also receive credit on the sentence for the time served in the jail ... subsequent to any conviction arising out of the original offense for which the defendant was tried.
>
> "It is only when the time spent in jail or prison is due to or, as the statute says, 'arises out of' the offense for which the sentence against which the credit is claimed that such allowance becomes a matter of right." Trigg v. State, 523 S.W.2d 375, 376 (Tenn.Crim.App.1975). If a defendant is in custody in a foreign state exclusively by virtue of the charges covered in the Tennessee extradition warrant, he should receive credit on the underlying conviction. See Trigg, 523 S.W.2d at 375. T.C.A. § 40-23-101 does not contemplate a defendant receiving pretrial jail credit for unrelated incarceration. See State v. Timothy Maurice Reynolds, No. M2003-02551-CCA-R3-CD, 2005 WL 351254, at *2 (Tenn.Crim.App. at Nashville, February 10, 2005) (citing State v. Frederick Cavitt, No. E1999-00304-CCA-R3-CD, 2000 WL 964941 (Tenn.Crim.App. at Knoxville, July 13, 2000). Likewise, T.C.A. § 40-23-101(c) will not permit a defendant to receive pretrial jail credits when the defendant "is convicted and incarcerated in another state after escaping the Tennessee prison system; or ... escapes confinement in Tennessee, is arrested and acquitted of charges in another state, and resists extradition back to Tennessee...." Cavitt, 2000 WL 964941 at *2 (citing State v. Abernathy, 649 S.W.2d 285, 285-86 (Tenn.Crim.App.1983); Majeed v. State, 621 S.W.2d 153, 154-55 (Tenn.Crim.App.1981); Trigg 523 S.W.2d at 376.)
>
> In the present cases, the defendant fled to Mexico to avoid prosecution for the rapes he committed. Federal authorities issued a warrant for Unlawful Flight to Avoid

16

> Prosecution, and on May 4, 2002, Mexican authorities arrested the defendant pursuant to the federal warrant. **Mexican authorities held the defendant in their custody based on the Federal Unlawful Flight to Avoid Prosecution warrant, which was a federal offense. Thus, the defendant's incarceration in Mexico arose from the federal crime of fleeing to avoid prosecution and not the rape charges in these cases. A defendant is not entitled to have the time served based on a federal charge credited to a state conviction.** See Cavitt, 2000 WL 964941 at *2 (noting that T.C.A. § 40-23-101 does not secure pretrial jail credits when a defendant is confined on separate federal convictions). **Accordingly, we conclude that the defendant is not entitled to pretrial jail credit for the jail time served in Mexico based on the federal offense.**

Martinez, 2010 WL 99345, at *13 (emphasis added).

Given the State court's finding that the cited pretrial credits involve Petitioner's confinement in federal custody, the state trial court was not required, under state law, to credit Petitioner for his pretrial confinement in Mexico based on the federal offense. Petitioner does not cite any clearly established Supreme Court precedent at the time of the state court decision that imposed any federal obligation on the separate sovereign. See Whalen v. United States, 445 U.S. 684, 689 n.3 (1980) ("within our federal constitutional framework the legislative power [includes] the power to define criminal offenses and to proscribe the punishments to be imposed upon those found guilty of them," but "[t]his is not to say that there are not Constitutional limitations upon this power.").

For these reasons, the Court concludes that the Petitioner's petition for the writ of habeas corpus should be denied.

An appropriate Order is filed herewith.

**ENTERED** this 8th day of August, 2013.

WILLIAM J. HAYNES, JR.
Chief Judge
United States District Court.

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| RUBEN MARTINEZ, | ) |
| | ) |
| Petitioner, | ) No. 3:10-00677 |
| | ) Chief Judge Haynes |
| v. | ) |
| | ) |
| JOSEPH EASTERLING, Warden, | ) |
| | ) |
| Respondent. | ) |

O R D E R

In accordance with the Memorandum filed herewith, the Petitioner's petition for the writ of habeas corpus is **DENIED** and this action is **DISMISSED with prejudice.** The Court **DECLINES** to issue a Certificate of Appealability under 28 U. S. C. § 2253(c).

This is the Final Order in this action.

It is so **ORDERED.**

ENTERED this 8th day of August, 2013.

WILLIAM J. HAYNES, JR.
Chief Judge
United States District Court.